# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 2 9 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

| | | |
|---|---|---|
| KEITH JACOCKS, | ) | |
| Plaintiff, | ) | Civil Action No. 7:04-cv-00587 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BILL HEDRICK, et al., | ) | By: Hon. James C. Turk |
| Defendant(s). | ) | Senior United States District Judge |

Plaintiff Keith Jacocks ("Jacocks"), a federal prison inmate, acting through counsel, filed an amended complaint, raising claims pursuant to the doctrine announced in Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics ("Bivens"), 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq. He claims that in August 2003, prison officials at the United States Penitentiary in Lee County ("USP Lee"), Virginia,[1] whether through deliberate indifference or negligence, failed to protect him from an inmate assault that caused him severe injuries, including the loss of his eye. He also claims that prison officials failed to provide adequate medical care after he was injured in the assault. Defendants filed a motion to dismiss or, in the alternative, motion for summary judgment that is now ripe for the court's consideration. Upon review of the motion, plaintiff's response, and the record, the court concludes that defendants are entitled to summary judgment as a matter of law.

---

[1] The amended complaint named the following defendants, all of whom join in this motion: the United States; Bill Hedrick, former Warden of the United States Medical Center for Federal Prisoners, located in Springfield, Missouri, and these employees or former employees of USP Lee: B. G. Compton, former Warden; Jerry Jones, former Associate Warden; C. M. Strickland, Associate Warden; Dennis Johnson, Associate Warden; Glen Friss, Lieutenant; Patrick Eldredge, Intelligence Officer; David Mrad, Intelligence Officer; Carlos Lopez, former Lieutenant; David Grieve, former Lieutenant; James Huff, former Lieutenant; William Cox, Intelligence Officer; William Johnson, former Special Investigative Agent; Jimmy Baker, Correctional Officer; and John Does.

1

## I. Background

### A. Procedural History

When Jacocks, proceeding <u>pro se</u>, filed this action on or about October 1, 2004,[2] he invoked

the diversity jurisdiction of this court, pursuant to 28 U.S.C. § 1332. In his complaint, he alleged

that prison officials failed to protect him from an assault by another inmate that injured Jacocks

severely; ultimately, he lost an eye as a result of those injuries. He also stated that he had completed

the Bureau of Prison ("BOP") administrative remedies procedure by filing BP forms 8 through 11

with United States Penitentiary Lee County, the BOP, and the United States Department of Justice,

but that he was not satisfied with the responses he received. Jacocks also moved to proceed <u>in forma</u>

<u>pauperis</u>.

The court construed the complaint as attempting to bring claims under <u>Bivens</u>, the FTCA,

and/or state law through the court's diversity jurisdiction. The court filed the case conditionally and

directed Jacocks to amend his complaint to state the type of claims he intended to bring, name any

additional defendants, state facts concerning the conduct each defendant took in violation of his

rights, and particularize the facts of his claims. On October 24, 2004, Jacocks signed and dated his

first amended complaint, naming additional defendants and offering a few more details, including

allegations that officials did not provide him with appropriate medical care after the injuries. The

---

[2]The court received Jacocks' complaint on October 1, 2004, as indicated by the court's stamp on the envelope. Jacocks initialed the last page of his complaint, but did not sign or date it. The envelope also indicates that the postal service had some trouble delivering the mail because Jacocks originally had the wrong post office box number in the address. Therefore, it is impossible to say from the evidence before the court exactly when Jacocks delivered the envelope to prison authorities for mailing with the correct address on it. See <u>Lewis v. Richmond City Police Dept</u>, 947 F.2d 733 (4th Cir. 1991) (inmate pleading filed for purposes of statute of limitations when signed and delivered to prison authorities for mailing).

amended complaint was still somewhat ambiguous as to the type of claims he wished to bring, however. Jacocks also incorporated by reference his previous complaint.

The court granted Jacocks' motion to proceed in forma pauperis, thus obligating the court to attempt service of process upon the defendants on Jacocks' behalf. See 28 U.S.C. § 1915(d). The court also decided that extraordinary circumstances[3] in this case warranted appointment of counsel to assist Jacocks in amending his complaint, see Cook v. Bounds, 518 F.2d 779, 780 (4th Cir. 1975), and delayed service of the complaint until an amendment clarified the claims and the defendants to be served. The effort to locate an attorney willing and qualified to represent Jacocks in this case proved difficult and took several weeks because of the remote location of USP Lee and the nature of the case. The court has no authority to force an attorney to represent an indigent, pro se civil plaintiff, as the court cannot compensate counsel for the work done on such a case. See, e.g., Mallard v. United States District Court, 490 U.S. 296, 309 (1989) (interpreting former version of 28 U.S.C. § 1915(d)). In January 2005, John P. Fishwick, Esq., agreed to accept the representation and was appointed by the court as counsel for Jacocks in this case by order entered January 27, 2005. Counsel filed an amended complaint on Jacocks' behalf on May 9, 2005, stating clearly that Jacocks was bringing claims under the FTCA and Bivens, and naming additional defendants, including the United States. The clerk then mailed notices of waiver of service to all defendants and served the United States. Counsel for defendants filed the motion to dismiss/motion for summary judgment in November 2005. The parties then engaged in discovery. As plaintiff has now responded to

---

[3]Jacocks received severe injuries, including the loss of his eye. He stated in the amended complaint that he was knocked unconscious during the assault, so had no personal knowledge of events that transpired immediately before or after he was injured. He also stated that he was transferred to another prison facility soon after the assault, making it difficult for him to investigate the circumstances of the incident on his own.

3

defendants' motion and defendants have filed a brief in reply, the dispositive motion is ripe for consideration.

## B. Statement of the Facts[4]

On August 14, 2003, Keith Jacocks was incarcerated at USP Lee. At approximately 9:35 a.m., Jacocks was sitting in the common area of his housing area, Unit K, watching television. Officer Sword, the Unit K floor officer, was in the outer doorway of the unit, monitoring inmates who had moved to the compound outside. While Sword's attention was directed elsewhere, Inmate J. Denis walked down the length of the unit and struck Jacocks several times about the head, shoulders, and chest with a homemade weapon—two combination locks affixed to the end of a belt. From his office on the upper tier, Counselor Torres heard a noise, came out of his office into the unit, and saw Denis striking Jacocks. Torres ordered Denis to stop and called for assistance on the radio . At around the same time, the floor officer, Sword, heard a thumping sound and reentered the unit to see Denis strike Jacocks several times in the upper torso. Sword used his body alarm to call for staff assistance as he walked toward the inmates. He ordered Denis to stop the assault and to back up and surrender his weapon. Denis stopped striking Jacocks and backed slowly away. Sword stepped between Jacocks and Denis. Torres ran down onto the floor and recovered the weapon from Denis. Torres later escorted the inmate to cell 319 where he was searched and placed in handcuffs.

Based on the calls for assistance from Torres and Sword, numerous staff members, including medical personnel and William Johnson, the Assistant Warden, responded to Unit K. Medical staff

---

[4]The court has compiled the facts recited here from review of the video surveillance footage of the incident and exhibits submitted by the parties. The videos (Dkt. 53, Attach. 1-2, and Dkt. 73, Attach. 1) and several of plaintiff's exhibits (Dkt. 71, Ex. 3, 9, 10, 11, and 12) are sealed for security reasons.

4

assessed Jacocks' injuries and provided him with medical attention. He suffered two 2 cm lacerations to his right eye, a 2.5 cm laceration behind his left ear, and contusions to his left flank. He was bleeding from his right eye orbit, and there was blood in his ear canals. Medical staff summoned an ambulance at 9:41 a.m. for an emergency trip to the local hospital. At 9:50 a. m., they placed Jacocks on a stretcher and moved him from the housing unit to the trauma care room in the prison's Health Services Department. The Clinical Director, who had responded to the Unit K and provided treatment for Jacocks there, started an IV line once Jacocks was transferred to the trauma care unit and monitored his condition until the ambulance arrived.

Meanwhile, non-medical staff members responding to the call for assistance on Unit K worked to lock other inmates in their cells and secure the unit. They conducted a search of the unit and interviewed all of the 46 inmates who were present in the unit at the time of the assault to see if they could determine what motivated it. When officers asked Denis why he assaulted Jacocks, he reported that Jacocks had robbed him of four packs of cigarettes.

At 10:10 a.m., a private ambulance arrived at USP Lee, and ambulance personnel took over Jacocks' medical care. The ambulance crew transported him to the Holston Valley Medical Center in Kingsport, Tennessee, where he underwent surgery to repair an extensive corneoscleral wound to his right eye. Doctors released Jacocks from the hospital on August 15, 2003, and officers returned him to USP Lee at approximately 9:30 p.m.

5

Medical records from the USP Lee medical unit[5] reflect that the hospital doctor's discharge instructions prescribed pain medication (Percocet) every four to six hours "as needed" and two different eye drops several times a day. The records also indicate that the prison trauma team evaluated Jacocks immediately upon his return, ordered the eye drops as prescribed by the hospital physician, and also ordered that Jacocks receive pain medication (Tylenol 3 with codeine) for pain as needed. According to the records, Jacocks received Tylenol 3 at 2:00 a.m., 6:00 a.m., 11:30 a.m., 6:10 p.m., and 11:45 p.m. on August 16, 2003, and continued to receive that medication at regular six to eight hour intervals from August 17 through 23, 2003. On August 24, 2003, that order was discontinued, but he received at least two doses that day. On August 28, 2003, he requested pain medication and was prescribed Motrin 800 mg for several days.

Prison officials arranged for Jacocks to be evaluated on August 26, 2003, by a local retinal specialist. As for the eye drops, staff dispensed the first few doses as prescribed. On August 16, 2003, staff provided Jacocks with bottles of the prescribed drops so that he could apply them himself. The medical summary for the transit form dated September 24, 2003, indicates that he was using two kinds of prescription eye drops when he was transferred from USP Lee to the Federal Medical Center ("FMC") in Springfield, Missouri. An entry by FMC staff indicates that he arrived

---

[5]Jacocks has alleged that he was not provided pain medication and treatment for his eyes some of the time while he was housed at USP Lee after the assault. He admits in a February 2006 affidavit, however, that he made these allegations without reference to his own medical records for that period. (Docket Number ("Dkt.") 70, Ex. 8). Accordingly, for purposes of background, the court summarizes the medical treatment reflected in those medical records without making any specific factual finding as to their accuracy in all respects. Because the court herein finds that Jacocks failed to exhaust his administrative remedies as to his claims concerning his medical treatment at USP Lee, disputes as to what treatment Jacocks received are not material.

6

at that facility with the prescribed eye drops. After his transfer to the FMC, doctors removed Jacocks' right eye and implanted a lucite ball in its socket.

## II. Opinion of the Court

Inasmuch as defendants have submitted evidence outside the record in support of their motion to dismiss, the court must treat the motion as a motion for summary judgment, applying the standard provided in Fed. R. Civ. P. 56. See Fed. R. Civ. P. 12(b). Summary judgment is proper where the court considers matters outside the record and finds that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Rule 56( c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). Instead, the non-moving party must respond, by affidavits or otherwise, and present specific facts from which a jury could reasonably find for either side. Anderson, 477 U.S. at at 256-57.

7

## A. Exhaustion of Administrative Remedies

In 1996, Congress enacted the Prison Litigation Reform Act ("PLRA") in an attempt to reduce the number of frivolous civil rights cases filed by prisoners. In the PLRA, Congress amended 42 U.S.C. § 1997e, the provision relating to prisoners' exhaustion of administrative remedies. This section requires that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This exhaustion requirement applies to all suits about prison life, not only to suits under 42 U.S.C. § 1983, whether such suits allege "general circumstances or particular episodes," "excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 524, 532 (2002). In such a lawsuit, the prisoner must exhaust administrative remedies even if the type of relief he seeks, such as monetary damages, is not offered under the available administrative process. Booth v. Churner, 532 U.S. 731, 734 (2001). A plaintiff's failure to exhaust administrative remedies under § 1997e(a) before filing the lawsuit is an affirmative defense that must be raised and pled by the defendant. Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 681 (4th Cir. 2005). The exhaustion requirement gives state prison officials an opportunity to correct their own mistakes before being hauled into federal court and creates a useful record for use in a subsequent judicial proceeding, should one still be warranted. Woodford v. Ngo, 126 S. Ct. 2378, 2385 (2006). Because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance," the grievant must comply with the critical procedural rules of the system. Id. at 2388.

8

Claimants seeking to bring an action under the FTCA against the United States for money damages must first present the claim to the appropriate agency and have the claim finally denied by the agency. 28 U.S.C. § 2675(a); McNeil v. United States, 508 U.S. 106, 113 (1993) (finding that pro se litigants are bound by requirement of filing initial claim to appropriate agency). To raise a Bivens claim, a federal prisoner must first raise his grievance through all levels of the BOP's Administrative Remedy Program ("ARP"). See 28 C.F.R. §§ 542.10, et seq.

**1. Exhaustion of Failure to Protect Claims**

Defendants concede that as to his claims that defendants failed to protect him from assault by a fellow inmate, Jacocks filed the required BOP forms under both of these administrative procedures before bringing this lawsuit. He completed the three steps of the ARP, and he filed an administrative tort claim. (Dkt. 53, Ex. B and Attach. 3). Accordingly, defendants agree that Jacocks complied with the exhaustion requirement under § 1997e(a) as to his failure to protect claims under the FTCA and Bivens.

**2. Exhaustion of Medical Claims**

Defendants contend, however, that Jacocks failed to exhaust his administrative remedies as to any of his claims of inadequate medical treatment. In response, Jacocks argues that by grieving the alleged "lack of prompt response" after the assault, he exhausted administrative remedies as to his medical claims, because "lack of prompt response" might also encompass failure to provide prompt medical attention at the scene. The court is not persuaded. The copy of the administrative tort claim Jacocks filed with the BOP does not so much as mention medical treatment. (Dkt. 53, Ex. B, Attach. 3). Although the grievances that Jacocks filed through ARP about the assault are not part of this record, Jacocks does not dispute defendants' evidence that these grievances did not mention

9

medical care. Id. Moreover, Jacocks offers no evidence whatsoever that his grievances about officers failing to respond to the assault put prison officials on notice that he was also dissatisfied with his medical care. No reasonable jury could find that he gave prison officials a fair opportunity to consider his medical complaints so as to satisfy the exhaustion requirement under § 1997e(a). Ngo, 126 S. Ct. at 2388.

Jacocks also argues that the pain and suffering he experienced after the loss of his eye are special circumstances that should excuse his failure to file grievances specifically addressing his medical concerns. He does not explain, however, why these same special circumstances did not prevent him from filing precisely worded grievances complaining that guards failed to protect him. For these reasons, the court concludes that defendants are entitled to summary judgment as a matter of law on the ground that Jacocks failed to exhaust his administrative remedies as to all of his claims alleging that he received inadequate medical treatment after the August 15, 2003, assault.

### 3. "Mixed Petition"

Defendants contend that the entire case must be dismissed because the amended complaint included both exhausted and unexhausted claims. This court and others have rejected the "mixed petition" notion as contrary to the intent of the PLRA to reduce the number of prisoner lawsuits.[6] See Graves v. Norris, 218 F.3d 884, 885 (8th Cir. 2000) (rejecting total exhaustion requirement); Hartsfield v. Vidor, 199 F.3d 305, 309 (6th Cir. 1999) (finding that district court properly dismissed only claims that were unexhausted under § 1997e(a) and addressed exhausted claims on the merits); Johnson v. True, 125 F. Supp. 2d. 186, 188 (W.D. Va. 2000). Finding this precedent persuasive, the

---

[6]A split exists among the circuit courts of appeals that have addressed this issue, the Fourth Circuit not being one. See, e.g. Jones Bey v. Johnson, 407 F.3d 801, 806 (6th Cir. 2005) (adopting total exhaustion requirement and citing other cases).

10

court will not dismiss the entire action because Jacocks did not exhaust administrative remedies as to part of his claims before filing this action. Rather, the court will dismiss only the medical claims pursuant to § 1997e(a) and will address the exhausted, failure to protect claims.

## B. **Bivens** Claim: **Deliberate Indifference to a Risk of Harm**

In Bivens, the Supreme Court recognized that federal courts have authority under 28 U.S.C. § 1331 to award monetary damages to persons who prove deprivation of constitutional rights through the conduct of federal officials. 403 U.S. at 392. See also Carlson v. Green, 446 U.S. 14 (1980) (applying Bivens in prison context). The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim, see Pressley v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987), as does deliberate indifference to a pervasive risk of harm. Farmer, 511 U.S. at 842-43; Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991). Prison officials who stand by as passive observers and unreasonably take no action to stop an assault by one inmate against another violate the victim inmate's Eighth Amendment right to be protected from such harms. Burks v. Pate, No. 04-6784, 119 Fed. Appx. 447, 450 (4th Cir. 2005) (citing Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir. 1978)). Prison supervisors with knowledge of a "pervasive and unreasonable risk" of harm may be held liable where they act obdurately, wantonly, or with deliberate indifference in response to the risk. Moore, 927 F.2d at 1315. In defining deliberate indifference, the Supreme Court held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

11

<u>Farmer</u>, 511 U.S. at 837. Even if an official knew of substantial risks, he may escape liability by proving that he took "reasonable measures to abate" that risk. <u>Id.</u> at 847.

**1. Jacocks' Claims**

In the amended complaint, Jacocks alleged that some or all the defendants acted with deliberate indifference to serious risks of harm in several respects on the day of the assault: (1) by failing to monitor and supervise the actions of the violent and dangerous inmates housed with Jacocks;[7] (2) by failing to take actions to prevent Inmate Denis from attacking other inmates, although they knew that Inmate Denis was of a violent nature; and (3) failing to intervene to stop the attack after Denis struck Jacocks and knocked him unconscious, causing Jacocks to suffer additional injuries, including the loss of his eye. Jacocks also alleges that the supervisory defendants were deliberately indifferent to a risk of harm to Jacocks (4) by creating and continuing a policy of not protecting inmates from each other and (5) by failing to supervise and train the subordinates who acted with deliberate indifference to the risks of harm to Jacocks on August 14, 2003.

**2. Defendants to Be Dismissed**

In response to defendants' motion for summary judgment, Jacocks conceded that he could not bring his stated claims against Defendant Bill Hedrick, because Hedrick was never warden of USP Lee as Jacocks had believed when filing his complaint. (Dkt. 71 at 5). Jacocks also conceded that he could state a claim against these other defendants named in the amended complaint: Friss,

---

[7]Jacocks also alleges that defendants were deliberately indifferent in that they failed to prevent the assailant from obtaining materials with which to build a weapon. He does not offer any evidence or specific argument in support of this claim or demonstrate that existing regulations do not constitute a reasonable response to the risk.

12

Eldridge, Myrad, Lopez, Grieves, Huff, Cox, Special Investigative Agent Johnson, and Baker. (Dkt. 71 at 12). Therefore, the court will dismiss all claims against these defendants.

### 3. Officer Sword's Deliberate Indifference

Jacocks contends that Officer Sword,[8] the floor officer for Unit K, acted with deliberate indifference to a specific risk of harm when he stationed himself in a manner contrary to the Special Post Orders for the unit while monitoring inmate movements. (Dkt. 70, Ex. 3). The General Post Orders for Unit K states that all officers should be "on constant alert for irregular or unusual movement of inmates." (Dkt. 70, Ex. 14). Jacocks argues that Sword knew from his post orders (general and special) that his actions placed inmates inside the unit at significant risk of harm from a prohibited act by another inmate, thus making his conduct deliberately indifferent.

The court reviewed carefully the video tape footage taken by surveillance cameras immediately before, during and after the assault (Dkt. 53, Ex. B, Attach. 1-3), the post orders, and Sword's descriptions of events (Dkt. 53, Ex. C; Dkt. 70, Ex. 5).[9] While references to different types of "inmate movement" are somewhat unclear, the court finds no material factual dispute as to Sword's conduct. He indicates that he was "standing at the entrance to the housing unit monitoring inmate movement, per my post orders." The video verifies his assertions about his position and his re-entry of the unit after the assault had already begun. Moreover, Warden Compton's response to Interrogatory 19 expressly states that Sword's positioning at the time of the assault was "consistent

---

[8]Plaintiff discovered Sword's name in discovery and first names him in the response to the summary judgment motion as a potential defendant.

[9]As several of these exhibits remain under seal for security reasons, the court will refer to their content only in general terms. Nevertheless, the court reviewed their content carefully in reaching this decision.

13

with policy," in reference to the post orders. (Dkt. 70, Ex.1). As plaintiff fails to articulate any evidence from which a reasonable jury could find that Sword's actions violated his post orders, the court finds no deliberate indifference arising merely from Sword's position when the attack occurred.[10]

Jacocks also argues that Sword demonstrated deliberate indifference through his slow response after he saw Denis striking Jacocks. As stated, the video footage depicts Sword, several seconds after the start of the assault, walking back into the common area of the unit, stopping to push his body alarm to call for staff assistance, and pointing to Denis, who then backs away from the victim. Sword moves between the assailant and the victim. Within seconds, Counselor Torres comes running up and then both officers move to disarm the assailant and usher him away from the scene. (Dkt. 53, Ex. B, Attach. 2).

No reasonable jury could find from the video and other evidence that Sword was indifferent, or failed to respond reasonably, to the assault. It is undisputed that the assault lasted only thirteen seconds, and some of that time had already elapsed when Sword entered the unit after hearing the thumping noises. His decision to call for staff assistance was reasonable, as he had no way of knowing whether the assailant intended to attack other inmates or staff with his weapon. Sword's choice to delay use of other intervention methods and first attempt an oral order for the attacker to stop the assault was also a reasonable response, as proven by the fact that the inmate obeyed the order. Suggestions that Sword should have moved more quickly into the unit, should have ordered

---

[10]No evidence suggests that Sword or any other officer knew before the assault of a specific risk that Denis would attack Jacocks when he did or in the manner that he did. It is undisputed that Jacocks did not ask any of the defendants for protection from Denis or any other inmate before the assault so as to put them on notice of a specific risk that Denis would attack Jacocks.

14

the inmate to stop the assault before calling for staff assistance—these allegations refer to judgment calls, choices Sword had to make quickly in his own discretion. Plaintiff presents no evidence from which a jury could find that Sword responded as he did out of callous disregard of the continued risks facing Jacocks. The court finds that Defendant Sword is entitled to summary judgment as a matter of law as to the <u>Bivens</u> claim.

**4. Supervisors' Deliberate Indifference**

Once Jacocks fails to establish a triable issue against Sword for deliberate indifference, he cannot hold Sword's supervisors liable for failing to train or supervise him. <u>See</u> <u>Slakan v. Porter</u>, 737 F.2d 368, 372 (4th Cir. 1984) (finding that supervisory officials could be liable under § 1983 to the extent that supervisory indifference or tacit authorization of subordinates' misconduct was a causative factor in the constitutional injuries inflicted by subordinates). On the other hand, supervisors who implement a policy or practice or failure to correct a policy or custom that they know creates a pervasive and unreasonable risk of harm from a specified source can be liable for failing to alleviate that risk. <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2[d] Cir. 1994); <u>see also</u> <u>A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center</u>, 372 F.3d 572, 581 (3rd Cir. 2004) (finding that allegations of deficient hiring and staffing in the prison setting are actionable Eighth Amendment claims). In such cases, plaintiff must demonstrate an affirmative causal connection between the official's creation of the policy or his corrective inaction and the alleged constitutional deprivation. <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986). He must also show that the defendants' continuation of the policy or practice constitutes deliberate indifference. A prison official will be liable under the Eighth Amendment "only if he knows that inmates face a substantial risk of serious

15

harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.

Jacocks alleges that supervisory defendants Compton, Jones, Strickland, and Johnson were on notice that Denis had a high security classification and had been involved in a prior altercation with another inmate. (Dkt. 70, Ex. 9-10). Yet, they placed this inmate into Unit K with Jacocks and other inmates. Defendants assert that all of the inmates at USP Lee in August 2003, including Jacocks himself, were high security inmates and were placed at the penitentiary for that reason. Moreover, they offer evidence that Jacocks' own disciplinary record in prison includes far more disruptive and dangerous infractions than Denis' record shows. (Dkt. 77, Ex. A, Attach. 2). The record also includes no evidence that these defendants had personal knowledge of Denis' record or of any bad blood between the two inmates. On this evidence, no reasonable jury could find that defendants knew Denis posed a specific risk to inmates in Unit K or to Jacocks in particular. Defendants are entitled to summary judgment as to this aspect of plaintiff's claims.

Jacocks also alleges that Compton, Jones, Strickland, and D. Johnson were responsible for the staffing plan at USP Lee that assigned only one officer to monitor a unit in the presence of over 45 inmates. (Dkt. 70, Ex. 9). He asserts that the general and special post orders require the Unit Officer to monitor the inmates' movements in such a way as to create predictable spans of time when the officer's attention must be directed away from the unit, leaving the inmates inside vulnerable to planned assaults from other inmates. Between August 2002 and August 2003, two other inmate assaults occurred during the required monitoring of inmate movements. (Dkt. 71, Ex. 11-12). Jacocks argues that these assaults put defendants on notice that the staffing and monitoring policies put inmates at risk of harm. Defendants' counsel counters that a record of only two assaults in a year

16

at a maximum security institution is "a testament to the prison staff's outstanding job ensuring that the penitentiary is run in an orderly and secure fashion." (Dkt. 77 n. 4). The record reflects that the two prior assaults occurred during different inmate movement times—the main line for the evening meal and the line for the unit metal detector. There is also no indication that the post orders for officers monitoring these movements were similar to the Unit K post orders in any significant way. Of course, inmate movement times in a penitentiary will present risks at any time. The court cannot find from evidence plaintiff presents, however, that defendants knew that the staffing and monitoring practices set out in the Unit K post orders presented a significant risk of harm. For the reasons stated, defendants are entitled to summary judgment on all of plaintiff's deliberate indifference claims.

## B. Issues under the Federal Tort Claims Act

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." FDIC v. Meyer, 510 U.S. 471, 475 (1994). The FTCA operates to waive the sovereign immunity of the United States such that the government may be "liable in tort in the same manner and to the same extent as a private individual under like circumstances" under the law of the state in which the conduct occurred. 28 U.S.C. § 2674; Baum v. United States, 986 F.2d 716, 719 (4th Cir. 1993). Various exceptions limit the liability of the United States under the FTCA, including the discretionary function exception set forth in 28 U.S.C. § 2680(a). This exception provides that the United States is not liable for

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

17

§ 2680(a). The Supreme Court requires a two-part inquiry to determine if the exception applies to an official's conduct: (1) whether the conduct involves an element of judgment or choice; and (2) whether the nature of the conduct is subject to public policy analysis relative to the regulatory scheme in question. United States v. Gaubert, 499 U.S. 315, 322-24 (1991). If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," then the discretionary function exception does not apply because "the employee has no rightful option but to adhere to the directive." Id. at 324. If an employee has a "range of discretion to exercise in deciding how to carry out" an assigned duty, such discretionary acts are protected under this exception, and sovereign immunity is not waived. Id. at 325.

If no exception applies and sovereign immunity is waived under the FTCA as to an officer's negligent acts, the United States may be held liable in monetary damages for personal injury, property loss, or death to the plaintiff, caused by the acts of a governmental employee within the scope of his employment if those acts meet the definition of negligence under state law. § 1346(b); Rayonier Inc. v. United States, 352 U.S. 315, 319-20 (1957). To prove negligence under Virginia law, plaintiff must (1) identify a legal duty of the defendant to the plaintiff, (2) a breach of that duty, and (3) injury to the plaintiff proximately caused by the breach. Talley v. Danek Medical Inc., 179 F.3d 154, 157 (4th Cir. 1999).

The court concludes that all of Jacocks' claims under the FTCA must be dismissed, either because he fails to prove negligence or because the challenged conduct falls within the scope of the discretionary function exception.[11]

---

[11]Because the court finds that defendants are entitled to summary judgment on this ground, the court need not analyze at length defendants' arguments that the case should be dismissed because Jacocks did not bring a timely amendment to name the United States as a defendant and that he failed

## 1. Unit Officer Sword

To the extent that the Special Orders for Unit K are mandatory, leaving Sword no choice, Jacocks' claim that Sword violated those mandatory orders does not fall within the exception. On the other hand, no triable issue of fact remains as to whether Officer Sword complied with those orders in positioning himself on August 14, 2003, to observe inmates' movements. An officer who complied with his mandatory orders did not breach his prescribed duty and so was not negligent. As for the remainder of Sword's actions on the morning of the assault, they fall within the scope of the discretionary function doctrine. Except for the positioning requirement for monitoring inmate movement, the post orders set out general directives to the Unit Officer, such as the duty to establish and maintain adequate control of inmates, to monitor their movements, and to "be on constant alert for irregular or unusual movement of inmates." (Dkt. 71, Ex. 3 and 14). The officer himself has discretion to determine how to carry out these directives, and in doing so, he considers the same policy issues that the orders themselves were designed to further–the need to maintain a safe and orderly prison. The United States is protected against liability for these discretionary actions under the exception in § 2680(a).

---

to accomplish timely service on this defendant. In brief, the court construed Jacocks' timely filed pro se complaint and amended complaint as raising claims under Bivens and the FTCA, despite his failure to name the United States as a defendant. Moreover, the court's efforts to obtain counsel for Jacocks delayed his ability to bring his second amended complaint to name the United States. See, e.g., Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 457-58 (1990) (recognizing that equitable tolling principles apply to filing time limits in suits against United States where litigant actively pursued rights by filing timely defective pleading). Once the court granted Jacocks in forma pauperis status, the court, and not Jacocks, was responsible for serving the proper defendants. See 28 U.S.C. § 1915(d). Again, the court, and not the plaintiff or his counsel, decided to delay serving any of the defendants until after counsel filed the amended complaint. Fed. R. Civ. P. 4(m) (providing that for good cause, court may extend 120-day period for serving defendants).

19

## 2. Supervisory Officials

The supervisory defendants' decisions regarding assignment of Denis and Jacocks to the same housing unit and staffing of that housing unit also fall within the discretionary function exception. Jacocks asserts that all the defendants are subject to the requirements of 18 U.S.C. § 4042, which charges prison staff with the duty of providing for the protection of all federal prisoners. Jacocks argues that Sword and the supervisory defendants failed to comply with this mandatory directive, because they failed to protect Jacocks from the assault. Other courts have held that although the § 4042 requirement to provide protection is mandatory, BOP officials retain sufficient discretion under that statute, as to the manner and means by which they fulfill that duty, to invoke the discretionary function exception. See Cohen v. United States, 151 F.3d 1338, 1342 (11th Cir. 1998) (dismissing inmate victim's FTCA claims because prison administrator's decision to place plaintiff's inmate attacker at minimum security prison fell within discretionary function exception); Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997) (finding that prison administrators' decision not to separate inmate from another inmate who threatened and ultimately attacked him fell within discretionary function exception). This court reaches the same conclusion and finds that the challenged administrative actions of the supervisory defendants in this case fall within the discretionary function exception. Thus, the government cannot be liable on Jacocks' claims that prison officials were negligent in assigning him and Denis to Unit K or USP Lee or in making staffing decisions and writing post orders to maintain security at USP Lee. See Santana-Rosa v. United States, 335 F.3d 39, 44 (1st Cir.2003) (holding that classification and assignment decisions, as well as the allocation of guards and other correctional staff, fall within discretionary

function exception to FTCA); Cohen, 151 F.3d at 1344. Thus, the United States is protected by sovereign immunity against Jacocks' claims that their conduct was negligent.

### 3. No negligence

In any event, the evidence does not support any claim that Sword, Compton, Strickland, Jones, or Johnson breached any legal duty to Jacocks or that any such breach proximately caused his injuries. Inmate Denis caused his injuries in thirteen seconds of violence with a weapon that he fashioned in secret from ordinary items of prisoner property. Even if one unit officer supervised only five inmates, his attention could be diverted for thirteen seconds. Two staff members, hearing the noise of the assault, responded quickly by calling for assistance and ordering the assailant to stop and he did. The officers got him under control, as numerous other staff members responded to the scene to secure the other inmates in the unit and to assess Jacocks' injuries and provide immediate medical attention. An ambulance was summoned within six minutes of the attack and plaintiff was moved from the housing unit by stretcher to the trauma care room in the Health Services Department. Once he was there, the Clinical Director himself started the IV and monitored Jacocks' condition until ambulance personnel arrived within about half an hour of the assault to transport him to the hospital for further assessment and treatment. Once he returned to the prison, the medical staff provided him eye drops and pain medication as he expressed need for it.[12] No reasonable fact finder could conclude from the evidence that any officer of the United States breached a duty of care to Jacocks or proximately caused his tragic injuries.

---

[12]There is no evidence to support Jacocks' conclusory assertion that the medical care he received at USP Lee caused him to lose his eye.

21

### III. Conclusion

For the reasons stated, the court finds no genuine issue of material fact in dispute and concludes that defendants are entitled to summary judgment. An appropriate order shall be issued this day.

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to counsel of record for the parties.

ENTER: This 29ᵗʰ day of September, 2006.

Senior United States District Judge